```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
DOROTHY L. CHAMBERS,

                            Plaintiff,           07-CV-0085

             v.                                  **DECISION**
                                                 **and ORDER**
MICHAEL J. ASTRUE, Commissioner
of Social Security,

                            Defendant.
_____
```

## **INTRODUCTION**

Plaintiff, Dorothy L. Chambers ("Plaintiff"), brings this action pursuant to Title II and Title XVI of the Social Security Act, seeking review of the decision of the Commissioner of Social Security ("Commissioner"), that the Plaintiff was not entitled to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), prior to January 6, 2000. Specifically, the Plaintiff alleges that the decision of the Administrative Law Judge, Robert T. Harvey ("ALJ"), that the Plaintiff was not disabled within the meaning of the Social Security Act prior to January 6, 2000, was not supported by substantial evidence in the record.

Both the Plaintiff and the Commissioner move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) ("Rule 12(c)"). The Plaintiff claims that the ALJ's decision is not supported by substantial evidence in the record. The Commissioner claims the opposite. After reviewing the entire record, this Court finds that the decision of the Commissioner is supported by substantial

evidence in the record. Therefore, for the reasons set forth below, the Commissioners motion for judgement on the pleadings is granted, and the Plaintiff's motion is denied.

## **BACKGROUND**

On April 30, 1999, Plaintiff, a former hospital laboratory clerk, filed an application for DIB and SSI, alleging disability since July 15, 1996 due to multiple sclerosis. Plaintiff had filed a previous application, on October 6, 1996, which was denied after an administrative hearing, in a decision dated July 28, 1998. Her current application was initially denied on March 2, 2000, and Plaintiff timely filed a request for a hearing before an administrative law judge.

Plaintiff appeared, with counsel, and testified at a hearing held on February 9, 2001 before ALJ Dennis O'Leary. ALJ O'Leary found that the Plaintiff was not disabled. The Appeal's Council remanded the case back to the ALJ level for further administrative review, and Plaintiff appeared at a second administrative hearing, before ALJ Robert T. Harvey, on February 21, 2002. ALJ Harvey found that the Plaintiff was disabled since November 1, 2001. The Appeal's Council again remanded the decision to the ALJ level for further proceedings, and a third hearing was held on August 2, 2005 before ALJ Harvey. The Plaintiff also appeared and testified at this hearing. In a decision dated October 27, 2005, ALJ Harvey found that the Plaintiff was disabled on January 6, 2000. This decision became the final decision of the Commissioner when the

Appeals Council denied further review. Plaintiff then filed this action to determine the onset of Plaintiff's disability. The issue in this case is whether the Plaintiff was disabled from July, 29, 1998, the date her previous application was denied, through January 6, 2000.

## DISCUSSION

### I. Jurisdiction and Scope of Review

42 U.S.C. §405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. When considering these cases, this section directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938). The Court's scope of review is limited to whether or not the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. See Monger v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding a reviewing Court does not try a benefits case *de novo*). The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F.Supp. 265, 267 (S.D. Tex. 1983) (citation omitted).

The Plaintiff moves for judgement on the pleadings pursuant to Rule 12(c), on the grounds that the ALJ's decision is not supported by substantial evidence in the record and is not in accordance with the applicable legal standards. The Commissioner claims that the ALJ's decision is supported by substantial evidence in the record and moves for judgment on the pleadings to affirm this decision. Judgment on the pleadings may be granted under Rule 12 (c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that "the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief," judgment on the pleadings may be appropriate. <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). This Court finds that there was substantial evidence in the record for the ALJ to find that the Plaintiff was not disabled within the meaning of the Social Security Act between July 29, 1998 and January 5, 2000. Therefore, the Commissioner's motion for judgment on the pleadings is granted, and the Plaintiff's motion is denied.

**II. There is Substantial Evidence in the Record to Support the Commissioner's Decision that the Plaintiff was not disabled from July 29, 1998 to January 5, 2000.**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Transcript of Administrative Proceedings at 16-24) (hereinafter "Tr."). The five-step analysis requires the ALJ to consider the following:

(1) Whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities;

(3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;

(4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;

(5) if the claimant's impairments prevent her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

Here, the ALJ found that (1) the Plaintiff has not engaged in substantial gainful activity at any time relevant to the decision; (2) the Plaintiff has the following severe impairments: multiple sclerosis, right shoulder acromioclavicular arthroplasty and a partial subscapularis tear, and affective disorder; (3) the Plaintiff does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) the Plaintiff could not perform any past relevant work; and (5) between July 29, 1998 and January 6, 2000, the Plaintiff had the residual functional capacity to perform the full range of sedentary work, after January 6, 2000, the Plaintiff could perform less than sedentary work with the following additional limitations: She cannot work at unprotected heights or around heavy machinery; she

Page 5

cannot climb, handle or finger with her right hand, push, pull or reach overheard with her right arm, and she could not crawl or squat; she could only occasionally bend and balance, feel with her upper extremities, maintain concentration and attention, and interact with the public; She could only work a job with minimal stress and she could not be exposed to cold or damp areas. (Tr. at 22-23). Therefore, the ALJ found that the Plaintiff was disabled after January 6, 2000, but not prior thereto. (Tr. at 23).

    A.    <u>The Medical Evidence</u>

The Plaintiff was diagnosed with multiple sclerosis ("MS") in September 1996, after a neurological examination by Dr. Patrick J. Hughes. (Tr. at 109-110). Plaintiff complained of numbness from the waist down and a recent CT revealed a small focus of hypoattenuation in the periventricular and white matter in the left parietal lobe. (Tr. at 107, 109). Upon examination, Plaintiff could walk unaided, strength was normal, reflexes were two plus and symmetrical, there were no pathological reflexes, and she had hypalgesia of both legs to the umbilicus with sacral sparring. (Tr. at 109-110). Dr. Hughes ordered an MRI and began a five day course of IV Methylprednisone. <u>Id</u>. The MRI revealed multiple ovoid shaped periventricular lesions, and a single high lesion in the right cerebral peduncle, suggesting a demyelinating process such as MS. (Tr. at 111). Dr. Hughes then prescribed Avonex after finding the MRI positive for MS. (Tr. at 112). He saw her again in November and noted that she was feeling better, going to therapy, and

continuing the take Avonex for MS. Id. She had tightness in her feet, but the numbness had cleared. Id.

Plaintiff was then evaluated by neurologist Dr. Lawrence Jacobs on December 30, 1996. (Tr. at 132). Dr. Jacobs also diagnosed MS, after reviewing the MRI and performing a physical examination, but ordered blood testing to confirm the diagnosis. (Tr. at 134). Upon examination, Plaintiff's visual acuity was 20/20 bilaterally, there were prominent optic pits, but no atrophy, and the range of eye movements was normal. (Tr. at 133). Strength and coordination were normal and she had normal reflexes. Id. She felt sensation in her feet differently than that in the rest of her body, but sensory status was otherwise normal. Id.

On January 28, 1997, Plaintiff presented to Buffalo General Hospital with difficultly walking and ataxic and wide based gait. (Tr. at 116). She was referred back to Dr. Jacobs. Id.

Dr. Jacobs re-evaluated her on April 22, 1997. (Tr. at 126). He reported that her blood work looked good, and her exam was the same. Id. He advised her to continue taking Avonex, but she was resistant because she did not like the injections. Id. He saw her again in October, and remarked that she was "doing great" and had been successfully taking Avonex for six months. (Tr. at 124). Her sensibility in her feet had improved to 80% of normal and she had not had any relapses in the past year. Id.

On May 15, 1998, Dr. Jacobs re-evaluated Plaintiff and found that she had improved. (Tr. at 123). Her eye movements were still

Page 7

slow, but the slowing was less than it was in December 1996. Id. The sensation in her feet had also improved. Id. Dr. Jacobs noted that she seemed stressed because of her disability hearing, and she was tearful. Id.

In July, Dr. Jacobs opined that Plaintiff's MS was in "complete remission." (Tr. at 122). He noted that she was "stressed", but had calmed down after beginning to take Paxil. Id.

Dr. Hughes saw Plaintiff again on February 11, 1999, after being transferred back from Dr. Jacobs. (Tr. at 167). He reported that she remained free from any MS exacerbations since he last saw her in 1996. Id. She complained of fatigue, numbness of the feet, and headaches, but could walk unaided, muscle strength was normal, there was no atrophy or abnormal movements, and extraocular movements were normal. Id. He started her on Symmetrel. Id. In March, Dr. Hughes examined the Plaintiff and reported the same findings. (Tr. at 166). He altered her medication from Symmetrel to Cylert, and advised she continue taking Avonex. Id. He cleared her for sedentary work. Id.

In April and May Dr. Hughes saw the Plaintiff and again reported the same findings. (Tr. at 161-2). She had no MS flare ups, and her MS was in remission. Id. He cleared her for light duty work in May. (Tr. at 161). Dr. Hughes findings remained unchanged through December 1999. (Tr. at 158, 160, 174).

On January 6, 2000, Dr. Mark Nepokroeff evaluated the Plaintiff. (Tr. at 168). He listed her medications as Avonex,

Prozac, Prevacid, tylenol, and Metochlopomimide. Id. He noted a history of depression for the last three months, but found her alert and oriented. (Tr. at 168-9). Her cranial nerves were intact, her gait, station and posture were normal, she was able to heel toe walk and did not use assistive devices. (Tr. at 169). She had no muscle spasms, rigidity, atrophy, or tremors, her motor strength in her upper and lower extremities was 3/5, and there were no sensory deficits. Id. Dr. Nepokroeff diagnosed her with MS, depression, GERD, chronic low back pain, and chronic knee pain. Id. He opined that she could work in a non-stressful environment with no heavy lifting and a mild limitation on ambulation. Id.

The Plaintiff's condition, as evidenced in the ALJ's opinion, began to deteriorate after January 6, 2000. On February 1, 2000, Plaintiff saw a Dr. Jack Wilson, Ph.D., for a psychiatric consultation. (Tr. at 172-3). Dr. Wilson stated that she was taking Prozac that she had gotten from her neurologist, and she reported she began experiencing symptoms of depression when her physical impairments began. Id. He stated that she was pessimistic about the future, her affect had thoughtful quality, and she was somewhat introspective. Id. She appeared passive aggressive, but she answered questions directly and her thought process was relevant, coherent, and free from delusions, hallucinations, obsessions, and phobias. Id. He diagnosed her with dysthymic disorder and personality disorder NOS with passive aggressive traits. Id. He stated her prognosis for depression was guarded. Id.

She was seen by Dr. James Slough on May 17, 2000, after and X-ray revealed a spur formation in the right acromioclavicular joint. (Tr. at 199, 208). She complained of shoulder pain radiating to the forearm and hand. (Tr. at 208). She had some numbness and tingling, slight decreased cross-chest adduction, and mild crepitation with internal and external rotation of the arm. Id. Tinel's and Phalen's signs were negative. Id. He diagnosed impingement syndrome and probable carpal tunnel syndrome, and advised stretching. Id. On a follow up examination in June, Dr. Slough reported that she had increased pain in the palm and forearm and up in the extensor and lateral epicondlye area. (Tr. at 207). He prescribed Ibuprofen and stretching. Id.

Plaintiff first saw neurologist Dr. Maurice Hourihane on July 11, 2000. (Tr. at 412-3). At that time her mental status appeared normal, her cranial nerves were normal, and she had full range extraocular movements with normal pursuits and saccades. (Tr. at 412). Her power appeared symmetrical. (Tr. at 413). He concurred with the diagnosis of MS and continued Avonex. Id.

Plaintiff remained stable through September 4, 2000, when she was treated at Millard Fillmore hospital for MS exacerbation. (Tr. at 221, 408). Dr. Hourihane saw her on September 26, 2000, and she complained of Lhermitte's phenomenon, bilateral hand numbness, and sensory changes. (Tr. at 406). Dr. Hourihane noted that her mood had changed significantly since he last saw her, she was irritable, slept frequently, and was angry most of the time. Id. He noted

She was seen by Dr. James Slough on May 17, 2000, after and X-ray revealed a spur formation in the right acromioclavicular joint. (Tr. at 199, 208). She complained of shoulder pain radiating to the forearm and hand. (Tr. at 208). She had some numbness and tingling, slight decreased cross-chest adduction, and mild crepitation with internal and external rotation of the arm. Id. Tinel's and Phalen's signs were negative. Id. He diagnosed impingement syndrome and probable carpal tunnel syndrome, and advised stretching. Id. On a follow up examination in June, Dr. Slough reported that she had increased pain in the palm and forearm and up in the extensor and lateral epicondlye area. (Tr. at 207). He prescribed Ibuprofen and stretching. Id.

Plaintiff first saw neurologist Dr. Maurice Hourihane on July 11, 2000. (Tr. at 412-3). At that time her mental status appeared normal, her cranial nerves were normal, and she had full range extraocular movements with normal pursuits and saccades. (Tr. at 412). Her power appeared symmetrical. (Tr. at 413). He concurred with the diagnosis of MS and continued Avonex. Id.

Plaintiff remained stable through September 4, 2000, when she was treated at Millard Fillmore hospital for MS exacerbation. (Tr. at 221, 408). Dr. Hourihane saw her on September 26, 2000, and she complained of Lhermitte's phenomenon, bilateral hand numbness, and sensory changes. (Tr. at 406). Dr. Hourihane noted that her mood had changed significantly since he last saw her, she was irritable, slept frequently, and was angry most of the time. Id. He noted

that she was skipping dosages of Avonex. Id. He diagnosed MS exacerbation, possibly due to skipped Avonex, and a significant amount of depression. (Tr. at 407). He recommended Prozac and stated that she had previously tried Paxil for one month without improvement. Id.

On October 16, 2000, Plaintiff again saw Dr. Hourihane who dianosed relapsing and remitting MS and significant depression. (Tr. at 405). He prescribed her Celexa and ordered an EMG and nerve conduction studies. Id. The EMG was normal with no evidence of focal neuropathy. (Tr. at 411).

On June 11, 2001, Dr. Hourihane reported that her relapsing MS remained stable, but she refused to consider another medication for her mood disorder. (Tr. at 404). On December 11, 2001, Dr. Hourihane again noted that she was somewhat depressed, but said that she did not want to take an anti-depressant at that time. (Tr. at 402). Dr. Hourihane also diagnosed relapsing-remitting MS, after an abnormal MRI, bilateral hand numbness, and positive Lhermitte's. Id.

Plaintiff saw Dr. Slough again on November 20, 2001. (Tr. at 397). Dr. Slough noted crepitation consistent with subacromial impingement and recommended arthroscopy and acromioplasty. Id. On January 4, 2002, Dr. Slough performed surgery and made a post-operative diagnosis of acromiolavicular arthropathy and partial subscapularis tear. (Tr. at 395). He prescribed hydrocodone and oxycontin. (Tr. at 396).

In 2005, Dr. John Leone reported that he had treated the Plaintiff since February 2000 for MS. (Tr. at 443). He stated that her most severe symptoms during this time were the numbess in her right hand, ankles, and feet, and fatigue. Id. He opined that she could not stand for more than 20-30 minutes at time and her right hand numbness prevents her from reliably using it. Id. He stated that her fatigue caused her to lie down or sleep for several hours each day and could not work without the opportunity to lie down between one and two hours per day. Id. While he had treated her since 2000, he opined that these symptoms were present as of 1998. Id.

    B.    <u>The ALJ Properly Considered the Opinion of Dr. Mark Nepokroeff and the Evidence of Plaintiff's Affective Disorder Prior to January 6, 2000.</u>

The Plaintiff argues that the ALJ gave too much weight to Dr. Nepokroeff's opinion because his medical licence was later revoked. (Plaintiff's Brief at 6). The ALJ found that the Plaintiff was disabled as of the date of Dr. Neporkoeff's examination. (Tr. at 17-18). The ALJ considered the opinions of the Plaintiff's treating sources, Dr. Hughes and Dr. Jacobs, prior to January 6, 2000, and determined that she was not disabled prior to that date. (See *supra* pg. 6-8; Tr. at 20). The ALJ then determined that, "The claimant's restrictive daily activities and significantly compromised functional ability were present as of January 6, 2000, pursuant to the impartial conclusions and finding s documented by Mark Nepokroeff, M.D." (Tr. at 20). For this reason, this Court

Page 12

agrees with the Commissioner, that the ALJ's consideration of Dr. Nepokroeff's opinion was not prejudicial to the Plaintiff's claim. (See Commissioner's Brief at 2). Had the ALJ not considered Dr. Nepokroeff's opinion, he would not have found her disabled as of the date of this examination. Likewise, the Plaintiff was not prejudiced by the consideration of Dr. Nepokroeff's opinion, because the opinions of her treating sources prior to this date were optimistic as to her condition, her prognosis, and her ability to work. (See *supra* at 6-8).

Plaintiff also argues that the ALJ did not accurately consider the plaintiff's mental status with regard to her residual functional capacity assessment prior to January 6, 2000. (Plaintiff's Brief at 7). The ALJ found that the Plaintiff's "depression did not warrant further restrictions prior to January 6, 2000." (Tr. at 20). The ALJ's finding is supported by the medical evidence and Plaintiff's testimony, as depression was first diagnosed in January 2000 and severe depressive symptoms was first noticed by Dr. Hourihane in September 2000, who noted that her mood had changed. (Tr. at 172-3, 407). Consultive physicians, Dr. Nepokroeff and Dr. Jack Wilson first diagnosed the Plaintiff with depression January and February 2000. (Tr. at 169, 172-3). Dr. Wilson noted that she was taking anti-depressants prescribed by her neurologist. (Tr. at 172-3). Dr. Nepokroeff said that her symptoms had been present for 3 months. (Tr. at 168). There was no evidence of a psychiatric evaluation or counseling prior to the February

2000 evaluation by Dr. Wilson, and Plaintiff's neurologists did not detail her symptoms of depression prior to 2000, other than to say she had stress.

Plaintiff testified in May 1998, January 2002, and August 2005 that she was not receiving counseling or treatment by a mental health professional . (Tr. at 518, 579-80, 610). Plaintiff testified in October 2000 that she had been prescribed anti-depressants by her neurologist, Dr. Hourihane. Plaintiff's neurologist prior to 2000, Dr. Jacob's, noted in July 1998 that the Plaintiff was stressed, but had calmed down after taking Paxil. Prior to January 6, 2000, this was the only mention of Plaintiff's affective disorder in the medical records. Therefore, the ALJ did not err in assessing that she was not limited by her affective disorder prior to January 6, 2000.

This Court finds that there is substantial evidence in the record to support the Commissioner's decision that the Plaintiff was not disabled from July 29, 1998 through January 6, 2000. There is also substantial evidence to support the ALJ's finding that she was disabled after January 6, 2000. The Plaintiff's treating neurologists, during the relevant period, both opined that her MS was in remission. Plaintiff did not seek treatment from mental health professionals during this period, and while Dr. Jacob's prescribed medication for depression, he reported that the medication "calmed her down." Plaintiff's symptoms of relapsing MS and severe depression were first reported by her treating

neurologist Dr. Hourihane, and two consultive physicians, Dr. Nepokroeff and Dr. Wilson, after January 6, 2000. In addition, the right shoulder acromiolavicular arthropathy and partial subscapularis tear was first diagnosed in May 2000. For these reasons, this Court finds that there is substantial evidence in the record to support the Commissioner's decision that the Plaintiff was not disabled prior to January 6, 2000.

## CONCLUSION

For the reasons set forth above, this Court finds that the Commissioner's decision to deny the Plaintiff benefits from July 29, 1998 to January 6, 2000, was supported by substantial evidence in the record. Therefore, I grant the Commissioner's motion for judgment on the pleadings. The Plaintiff's motion is denied, and her complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

                                                s/Michael A. Telesca
                                                MICHAEL A. TELESCA
                                      United States District Judge

Dated:    Rochester, New York
           May 1, 2009